## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| REGINA P.,[1] | ) | No. 19 CV 3155 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| ANDREW M. SAUL, Commissioner of | ) | |
| the Social Security Administration, | ) | |
| | ) | July 29, 2020 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Regina P. seeks disability insurance benefits ("DIB") based on her claim that her fibromyalgia, back and knee pain, and anxiety render her unable to work full-time. Before the court are the parties' cross-motions for summary judgment. For the following reasons, Regina's motion is denied and the government's is granted:

### Procedural History

Regina filed her DIB application in March 2016, alleging a disability onset date of August 1, 2013. (Administrative Record ("A.R." 10).) After her claim was denied initially and upon reconsideration, Regina was granted a hearing before an administrative law judge ("ALJ"). (Id. at 113, 128.) Regina, a medical expert ("ME"), and a vocational expert ("VE") each testified at the March 2018 hearing. (Id. at 34.) On June 7, 2018, the ALJ who presided over the hearing issued a decision concluding that Regina is not disabled. (Id. at 21.) After the Appeals

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only Plaintiff's first name and last initial in this opinion to protect her privacy to the extent possible.

Council denied Regina's request for review, (id at 1-6), the ALJ's decision became the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Regina brought this lawsuit seeking judicial review of the Commissioner's final decision, *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 7).

## Facts

In the years leading up to her alleged disability onset date, Regina worked as a customer service representative, a social service aide, and a salon manager. Regina stopped working in 2013 because, according to her, she could no longer manage the walking and standing requirements of her salon job, and the combination of her fibromyalgia symptoms, back and knee pain, and anxiety prevented her from performing other work. (A.R. 53.) At her hearing before the ALJ, Regina presented medical records and testimony in support of her claim.

## A. Medical Evidence

The medical records Regina provided to the ALJ show that around the time of her alleged disability onset date, August 1, 2013, Regina's primary medical issue was abdominal pain that periodically caused nausea and vomiting. (A.R. 206.) She sought emergency treatment for those symptoms twice in December 2013 and was hospitalized for two nights in January 2014 because of acute abdominal pain and vomiting. (Id. at 428-29, 447, 535-36.) At a follow-up appointment two days after she was released from the hospital, Regina reported feeling better and presented without back pain, muscle weakness, fatigue, or joint pain. (Id. at 631, 633.) About

two months thereafter, Regina reported feeling better but sought medication for anxiety. (Id. at 623, 626.) After that visit, Regina did not seek treatment for her abdominal pain until December 2016, when she reported epigastric pain and underwent a successful hernia repair surgery. (Id. at 848, 851.)

The bulk of Regina's medical records consists of notes from her treatment relationship with Dr. Calvin Fischer. In September 2014 Regina told Dr. Fischer that she had been very anxious because of family stress and that she was suffering from back pain. (Id. at 203.) On examination Dr. Fischer noted that Regina had a normal mood and affect, normal memory, normal ambulation and gait, and normal movement in all of her extremities. (Id. at 204.) He prescribed Lorazepam for her anxiety and hydrocodone for her back pain. (Id. at 205.)

Throughout 2015 Regina visited Dr. Fischer for prescription refills. At times she reported feeling depressed and anxious, (see id. at 197-98, 606, 612), while at other times she denied being depressed, (id. at 193, 617). In 2015 Regina reported joint pain and back pain, telling Dr. Fischer that she could not describe the pain but that it was "just chronic." (Id. at 194, 198, 615, 619.) In December 2015 Regina reported severe pain in her right knee, which she had experienced for two weeks, and panic attacks. (Id. at 606.) Dr. Fischer's 2015 examination notes reveal that he found Regina to have a normal gait, no muscle weakness, no dizziness, and no swelling. (See, e.g., id. at 606, 609, 612, 618.) Dr. Fischer often noted that Regina had no back pain. (Id. at 198, 615, 618, 620.) In addition to prescribing

3

medications, Dr. Fischer performed spinal manipulations as a form of treatment. (Id. at 199.)

On March 24, 2016, Regina visited Dr. Fischer and he completed a Medical Source Statement in support of her disability claim. (Id. at 643.) His notes from this visit state that Regina had tender points but exhibited no exercise intolerance, no shortness of breath, no weakness, no dizziness, normal motor strength, and a normal gait. (Id. at 778.) However, in his Medical Source Statement, Dr. Fischer checked boxes indicating that Regina suffered from muscle pain, muscle weakness, dizziness, shortness of breath, insomnia, fatigue, depression, anxiety disorder, waking unrefreshed, abdominal pain/cramps, nervousness, and panic attacks. (Id. at 643-44.) Dr. Fischer opined that Regina met the criteria for fibromyalgia, and suffered from pain "every day, all day." (Id.) Dr. Fischer checked another box indicating that Regina would be off-task for more than 25% of a given workday, and he wrote that she is incapable of performing even low-stress work. (Id. at 646.)

In June 2016 Regina underwent two consultative examinations at the behest of the Social Security Administration. The first was with a consulting psychologist, who noted that Regina presented with an anxious affect but euthymic mood. (Id. at 665.) She denied being depressed but reported anxiety related to her pain and limited mobility. (Id.) The consulting psychologist characterized Regina as having a fair to moderately anxious but stable mood. (Id.) That same day a consulting internal medicine specialist, Dr. Mahesh Shah, ordered x-rays of Regina's spine and right knee, which revealed mild scoliosis, degenerative disc disease at L4-L5 and

L5-S1, facet joint arthropathy in the lower lumbar spine, and a normal right knee. (Id. at 662.)  Dr. Shah examined Regina and noted that she arrived without an assistive device but walked with a slight limp and appeared anxious and claustrophobic.  (Id. at 657.)  He noted tenderness in Regina's lumbar spine but characterized her scoliosis as "minimal."  (Id. at 658.)  Dr. Shah wrote that Regina had marked tenderness in her right knee and mild, vague tenderness in her other joints without swelling.  (Id. at 659.)  Other than in her right knee, Regina showed a full range of motion and full motor strength in her upper and lower extremities and normal grip.  (Id.)  Dr. Shah noted that Regina did not need an assistive device. (Id.)  Eleven days after her two consultative examinations, a consulting psychologist and a consulting physician reviewed the medical record and opined that Regina has only mild mental health limitations and retains the residual functional capacity ("RFC") to sit for six hours and stand or walk for two hours in an eight-hour workday.  (Id. at 107, 109.)

In July 2016 Regina sought treatment with a chiropractor, reporting that her main complaints were neck and back pain and rating her pain as a nine out of ten on the pain scale.  (Id. at 669, 674, 676.)  She also had appointments with Dr. Fischer, reporting abdominal and back pain but no muscle aches, muscle weakness, or exercise intolerance.  (Id. at 173, 690.)  Dr. Fischer diagnosed her with chronic pain syndrome and thoracic, lumbar, and sacral somatic dysfunction, and treated her with spinal manipulation.  (Id. at 690-91.)

In August and September 2016 Regina sought treatment with Dr. Nisrag Gandhi, a rheumatologist. Regina complained of joint pain all over her body, muscle stiffness, and fatigue. (Id. at 734, 740.) At her first appointment Dr. Gandhi noted that Regina exhibited a normal, painless range of motion in her extremities, but was tender at all of the fibromyalgia points, especially in her upper neck. (Id. at 743.) Dr. Gandhi noted that Regina's symptoms include extreme joint pain, muscle pain, trouble walking, swollen joints, extreme full body pain, weight gain, shortness of breath, morning stiffness, joint pain, muscle weakness, muscle tenderness, memory loss, anxiety, and difficulty sleeping. (Id. at 747-48.) But a week later Dr. Fischer examined Regina and found that she had tenderness but no muscle weakness, no shortness of breath, normal muscle strength, normal movement of extremities, and no swelling. (Id. at 683.)

At her September 2016 appointment, Regina again complained of joint pain, especially in the right knee, which increased when climbing stairs. She reported that she was suffering from fatigue that impacted her daily activities. (Id. at 733-34.) Dr. Gandhi wrote that Regina had multiple tender joints but no swollen joints, a normal and painless range of motion in her wrists and ankles, full but painful range of motion in her knee, and tenderness in all fibromyalgia points. (Id. at 735.) Dr. Gandhi diagnosed Regina with myofascial pain syndrome and clinical bilateral knee osteoarthritis. (Id.)

In December 2016 another state consulting psychologist and another state consulting physician reviewed the medical record and agreed with the initial

consultants' opinions. Specifically, they opined that the record supports a finding that Regina has no more than mild mental health limitations and retains the RFC to perform sedentary work with some extra limits. (Id. at 121-24.)

From 2017 to March 2018, Regina sought treatment only with Dr. Fischer. Throughout this period, Regina told Dr. Fischer she was experiencing joint pain, although Dr. Fischer noted that she had no muscle weakness, no shortness of breath, no joint pain, back pain, or swelling, no depression or sleep disturbance, no weakness, dizziness, or headaches, normal movement in all extremities, and a normal gait. (Id. at 821-22.) In March 2018 Dr. Fischer assessed Regina as having controlled fibromyalgia syndrome but completed a statement saying that the limitations described in his March 2016 Medical Source Statement were still applicable. (Id. at 1094-95.)

## B.  Hearing Testimony

At her March 2018 hearing before the ALJ, Regina testified that she has excruciating knee pain that has been resistant to treatments like chiropractic manipulations or cortisol shots, and that she uses a walker prescribed by Dr. Fischer because of the pain. (A.R. 44, 47-49.) Even with the walker she said that she has had difficulty walking for two years, and that she is unable to stand for more than 10 or 15 minutes. (Id. at 52.) She testified that she also needs the walker because she has experienced dizziness every day for three or four years and could lose her balance. (Id. at 45-46.) Regina said that she takes hydrocodone and an anti-inflammatory medicine for knee pain, but it does not help, and she

attributed her dizziness to these medications. (Id. at 46, 51.) Regina testified that she is anxious about falling down, and although she has been prescribed anti-anxiety medication, she only takes it when she "absolutely need[s] it," which is once or twice a month. (Id. at 64, 72.)

With respect to daily activities, Regina testified that she drives to the store and does light cooking while taking breaks. (Id. at 42-43.) She also paints as her hobby in 30-minute stints. (Id. at 70.) Regina testified that she avoids stairs because of her knee pain and can only sleep for two or three hours at a time because of her pain. (Id. at 58, 61-62.) She reported being limited by fatigue, because she has to lie down for 30 minutes to an hour after being up for three hours. (Id. at 56.) Regina testified that she tried working 15 hours a week as a hospital greeter, but she needed to lie down because of her pain and fatigue. (Id. at 57.)

**C.    The ME's Testimony**

ME Dr. Gilberto Munoz also provided testimony at the hearing, after reviewing Regina's records and observing her hearing testimony. Dr. Munoz testified that with respect to her knee pain, Regina's osteoarthritis was documented as mild to moderate in her right knee but only mild in her left knee. (A.R. 81.) He noted that Regina had not been given consistent or aggressive knee pain treatment and pointed out that she had never been referred to an orthopedist. (Id. at 84.) Dr. Munoz noted that mild to moderate osteoarthritis is a common finding for a person of Regina's age, and pointed out that there is no evidence to support her testimony regarding her need for a walker. (Id. at 83-84.) Dr. Munoz further

testified that Regina was diagnosed with fibromyalgia after her doctors ruled out lupus or rheumatoid arthritis, and that this condition is characterized by widespread chronic pain, heightened pain response to pressure, fatigue, and sleep and memory problems.  (Id. at 89-90.)  Dr. Munoz said that if her fibromyalgia pain were fully credited, Regina would be limited to sedentary work.  (Id. at 86.)  He also considered the impact of Regina's obesity but concluded that because she has only mild, "class I" obesity, it would not have an impact on her RFC.  (Id. at 83-84.)

**D.      The ALJ's Decision**

In concluding that Regina is not disabled, the ALJ engaged in the requisite five-step analysis that applies in the DIB context.  *See* 20 C.F.R. § 404.1520(a).  At steps one and two, the ALJ found that Regina had not engaged in substantial gainful activity between her alleged disability onset date and her date last insured, and that she suffers from severe impairments including obesity, anxiety, degenerative disc disease of the lumbar spine, chronic pain syndrome, fibromyalgia, Hashimoto's thyroiditis, and bilateral knee degenerative joint disease.  (A.R. 12.)  At step three the ALJ wrote that none of these severe impairments meets or medically equals a listed impairment and determined that Regina's anxiety causes moderate limitations in interacting with others and in concentrating, persisting, or maintaining pace.  (Id. at 12-13.)  Before turning to step four, the ALJ assessed Regina as having an RFC for sedentary work with some additional limitations, including that she:

> is limited to simple, routine, repetitive tasks and has sufficient
> concentration, persistence or pace to complete such tasks timely and

> appropriately, with no fast-paced production rate or strict quota
> requirements. Lastly, the claimant can have occasional contact with
> co-workers and supervisors and none with the general public.

(Id. at 14.) In reaching this RFC determination, the ALJ discounted Dr. Fisher's

opinions from his Medical Source Statement and Regina's testimony, but gave

significant weight to the ME's opinion. (Id. at 18-19.) Based on the assessed RFC,

the ALJ concluded at step four that Regina could not return to any past relevant

work, but at step five, the ALJ determined that she would be able to perform two

sedentary jobs that exist in significant numbers in the national economy. (Id. at 20-

21.) Accordingly, the ALJ concluded that Regina is not disabled. (Id. at 21.)

## Analysis

Regina argues that the ALJ's decision should be reversed because, according

to her, the ALJ erred in evaluating her testimony, weighing Dr. Fischer's opinions,

and assessing her RFC. The court will affirm the Commissioner's final decision if

"the ALJ applied the correct legal standards in conformity with the agency's rulings

and regulations and the conclusion is supported by substantial evidence." *Prater v.

Saul*, 947 F.3d 479, 481 (7th Cir. 2020). "Substantial evidence means 'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Id.* (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation marks and

citation omitted)). In conducting its review, the court will not substitute its

judgment for the ALJ's or reweigh the underlying evidence. *Summers v. Berryhill*,

864 F.3d 523, 526 (7th Cir. 2017). So long as the ALJ's decision is supported by

substantial evidence the court must affirm it, even if reasonable minds could

disagree as to whether the claimant is disabled. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

**A      Symptom Assessment**

Because the ALJ's assessment of Regina's subjective symptoms impacts most other aspects of the disability decision, the court begins there. *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (noting that an erroneous credibility determination requires remand unless the remainder of the ALJ's decision does not depend on it). Regina argues that the ALJ erred by improperly evaluating her daily activities and sitting limitations and incorrectly characterizing the nature of her treatment and medication side effects. (R. 12, Pl.'s Mem. at 13-15.) The ALJ's evaluation of Regina's testimony and subjective symptom statements is entitled to "special deference," and the court will overturn that evaluation only if it is "patently wrong." *See Summers*, 864 F.3d at 528 (citation omitted).

According to Regina, the ALJ improperly relied on her daily activities in discounting her description of her pain and other symptoms. The applicable regulations authorize ALJs to consider a claimant's daily activities as a factor in evaluating subjective symptom statements. *See* 20 C.F.R. § 404.1529(c)(3). Although the Seventh Circuit has cautioned ALJs not to equate daily activities with the ability to perform full-time work, *see Beardsley v. Colvin*, 758 F.3d 834, 838-39 (7th Cir. 2014), that is not what the ALJ did here. Instead, the ALJ noted that Regina was able to drive, prepare light meals, paint for 30 minutes at a time, and engage in chores, and determined that those activities undermined her testimony

regarding the severity of her pain and difficulty sitting. (A.R. 19.) The ALJ was permitted to consider that mismatch between Regina's daily activities and her symptom description. *See Green v. Saul*, 781 Fed. Appx. 522, 526-27 (7th Cir. 2019). Regina faults the ALJ for failing to consider her testimony that she limited her driving because of her anxiety and took a long time to perform tasks like cooking, but this court is not permitted to reweigh evidence, *Summers*, 864 F.3d at 526, and the ALJ's decision not to highlight those aspects of Regina's testimony does not render the evaluation patently wrong, *see Morrison v. Saul*, 806 Fed. Appx. 469, 474-75 (7th Cir. 2020) (rejecting argument that credibility assessment must be reversed because ALJ overlooked pace at which claimant performed daily activities).

Next Regina argues that the ALJ overlooked evidence from her chiropractor in finding that her testimony about her sitting limitations was less than fully credible. To the contrary, the ALJ discussed the chiropractor's findings and noted that they were inconsistent with examination findings by both Drs. Shah and Fischer. The ALJ noted that "the record does not contain any ongoing or consistent limitation on the claimant's ability to sit," (A.R. 19), and Regina has not highlighted evidence that undermines that conclusion. Because the ALJ specifically addressed the evidence Regina says he overlooked, this aspect of her argument carries no weight.

Regina also argues that the ALJ erred in discounting her symptoms based on a determination that her treatment was conservative and overlooked her testimony

regarding the impact of her medication side effects.  (R. 12, Pl.'s Mem. at 14-15.)  In characterizing her treatment as "conservative," the ALJ pointed out that Regina's main course of pain management was chiropractic care and noted that she had never been referred to an orthopedist or surgeon for pain management.  (A.R. 19.) The ALJ also observed that there was no evidence supporting her testimony that she needs a walker to ambulate.  (Id.)  According to Regina, chiropractic treatment, joint x-rays, and "a two year pain medication regimen" cannot be considered conservative forms of treatment.  (R. 12, Pl.'s Mem. at 14.)  The court will not substitute its judgment for that of the ALJ's as to what constitutes conservative treatment, see *Summers*, 864 F.3d at 526, especially where Regina has not pointed to evidence undermining the ALJ's characterization of her treatment or explaining why she did not seek other forms of treatment.

Regina also asserts that the ALJ erred in dismissing her description of medication side effects—such as drowsiness—for being inconsistently documented in the records, arguing that the ALJ should have considered that she might not report side effects if they were outweighed by her medication's benefits.  (R. 12, Pl.'s Mem. at 15.)  But according to Regina her medications provided almost no relief, (A.R. 51), so that would not be an obvious line of inquiry for the ALJ to pursue.  The ALJ did not overlook Regina's allegations of medication side effects, and it was not patently wrong for the ALJ to discount them based on a lack of support in the records.  *See Colangelo v. Berryhill*, No. 15 CV 6777, 2017 WL 3453375, at *7 (N.D.

Ill. Aug. 11, 2017). For these reasons, the court concludes that the ALJ did not commit reversible error in evaluating Regina's description of her symptoms.

## B. Treating Physician

Next Regina takes issue with the ALJ's handling of Dr. Fischer's Medical Source Statement, in which he wrote that her symptoms would keep Regina off-task for more than 25% of a given workday, that she is incapable of performing even low-stress work, and that she experiences pain "every day, all day." (A.R. 644-46.) The ALJ assigned "little weight" to what he described as Dr. Fischer's "extreme" description of Regina's limitations, explaining that the opinion is "conclusory and speculative," inconsistent with the treatment Regina received and Dr. Fischer's own treatment notes, and out of proportion with Dr. Fischer's own characterization of her fibromyalgia as being "controlled" and "stable" in 2018. (Id. at 18.)

Regina first argues that the ALJ failed to consider the appropriate factors in concluding that Dr. Fischer's opinion is entitled to only little weight, asserting that the ALJ should have accounted for the length and frequency of the treating relationship and misinterpreted the Medical Source Statement as being inconsistent with the record evidence. (R. 12, Pl.'s Mem. at 10-11.) For claims like Regina's that were filed before March 27, 2017, the regulations provide a number of factors the ALJ may consider in determining what weight to give a treating physician's opinion in situations where the opinion is not entitled to controlling weight, because it is either not supported by medically acceptable techniques or is inconsistent with other substantial evidence. *See Kuykendoll v. Saul*, 801 Fed.

14

Appx. 433, 437 (7th Cir. 2020). Those factors include the length and frequency of the treating relationship, the nature and extent of that relationship, the supportability of the doctor's opinion, and the consistency of the opinion with the record as a whole. 20 C.F.R. § 404.1527(c). Regina is correct that the ALJ did not explicitly consider the length and frequency of her treating relationship with Dr. Fischer in giving his opinion little weight, but an ALJ is not required to "explicitly discuss and weigh each factor," so long as he minimally articulates his reasoning. *See Collins v. Berryhill*, 743 Fed. Appx. 21, 25 (7th Cir. 2018).

Here the ALJ adequately explained the finding that Dr. Fischer's Medical Source Statement is inconsistent with his treatment notes and unsupported by the record, pointing out that Dr. Fischer noted throughout the record that Regina presented with normal motor strength and normal movements in all extremities, and that she reported no exercise intolerance in 2016. (A.R. 16, 18.) Those findings are inconsistent with Dr. Fischer's Medical Source Statement, where he checked boxes indicating that Regina has muscle weakness and shortness of breath. (Id. at 644-45.) The ALJ also found that limitations such as being unable to perform even low-stress work and a 25% off-task rate are unsupported by the level of treatment she received, pointing out that despite being referred to physical therapy by her rheumatologist, "[t]he records are devoid of any ongoing or consistent physical therapy treatment." (Id. at 16, 18.) Regina argues that the Medical Source Statement is consistent with both her subjective complaints and with records confirming her high levels of anxiety. (R. 12, Pl.'s Mem. at 11-12.) But as described

15

above, the ALJ gave supported reasons for discounting Regina's subjective complaints, and she points to no specific evidence that the ALJ overlooked that would support Dr. Fischer's statement that her anxiety is so severe as to be work-preclusive.[2]

Next Regina faults the ALJ for discounting Dr. Fischer's opinion in part because he did not provide a function-by-function assessment of her abilities. Although she is correct that a treating physician need not provide a function-by-function assessment for his opinion to hold weight, so long as the ALJ provides other supported reasons for discounting the opinion, the ALJ's reference to that deficiency does not amount to reversible error. *See Olivas v. Saul*, 799 Fed. Appx. 389, 392 (7th Cir. 2019). Moreover, the ALJ's concern centered on Dr. Fischer's opinion being "conclusory and speculative." (A.R. 18.) The Seventh Circuit has observed that check-box opinions like the one Dr. Fischer submitted are less helpful than narrative discussions, and the ALJ was entitled to point to the conclusory nature of his opinion as a reason to discount it. *See Gebauer v. Saul*, 801 Fed. Appx. 404, 410 (7th Cir. 2020) (noting with approval ALJ's decision to discount physician opinion communicated by checking boxes on form rather than through "open-ended assessments" of claimant's limitations); *see also Kuykendoll*, 801 Fed. Appx. at 437-38.

---

[2]   It is also worth noting—although the ALJ did not address it—that Regina testified that she only takes anti-anxiety medication when she really needs it, which only happens once or twice a month.  (A.R. 64, 72.)

Regina further faults the ALJ for describing her course of treatment as "conservative" and for pointing to Dr. Fischer's statements that her condition was "stable" in explaining the decision to discount the Medical Source Statement. With respect to the nature of her treatment, Regina does not dispute the ALJ's characterization of her treatment as "conservative"—a characterization the ME's testimony supports, (A.R. 84)—but rather faults the ALJ for inferring from her conservative treatment that her symptoms are not as severe as Dr. Fischer reported, (R. 12, Pl.'s Mem. at 12). An ALJ may consider the claimant's treatment when weighing a treating physician's opinion, see 20 C.F.R. § 404.1527(c)(2), and without more argument from Regina, the court sees no error in the ALJ's treatment of that factor here. As for Regina's argument that her condition could be "stable" but still disabling, that is of course true. But here the ALJ noted that Dr. Fischer's 2018 statements that her condition is not just "stable" but "controlled" with medication suggests that her symptoms are responsive to treatment in a way that is at odds with the extreme limitations described in his Medical Source Statement. (A.R. 18.) In other words, the ALJ could reasonably conclude that it is inconsistent for a physician to characterize a claimant's condition as "controlled," while opining that the same claimant is incapable of working and is in pain "every day, all day." That inconsistency permits the ALJ to discount Dr. Fisher's opinion. *See Burmester v. Berryhill*, 920 F.3d 507, 512-13 (7th Cir. 2019). This court can only overturn an ALJ's analysis of a treating physician's opinion when the circumstances suggest

17

that analysis is patently wrong, *see Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018), but that is not the case here.

## C.    The RFC Assessment

Regina argues that the ALJ committed reversible error in assessing her RFC because the ALJ failed to account for her fatigue and her obesity in concluding that she can perform sedentary work.  With respect to fatigue, Regina is correct that the ALJ did not directly address this symptom in a head-on manner.  Although the ALJ discussed her complaints of drowsiness associated with her medications, (A.R. 19), Regina's testimony regarding those side effects was distinct from her testimony regarding general fatigue, (id. at 55-56, 63).  According to Regina, the ALJ's failure to specifically address fatigue should not be characterized as harmless error because: she was diagnosed as having chronic fatigue syndrome; she testified that she has to sleep every three hours; and fatigue "may have caused her" to be off-task for more than 15% of the workday.  (R. 12, Pl.'s Mem. at 9.)

This court's review of the record and the ALJ's decision supports a conclusion that any error in the ALJ's failure to directly discuss Regina's alleged fatigue in devising the RFC was harmless.  To the extent Regina points to her own testimony to support a fatigue-related limitation, as discussed above, the ALJ's decision to discount her symptom statements is supported by substantial evidence.  Similarly, the only evidence Regina identifies to support a chronic fatigue syndrome diagnosis is the checked box in Dr. Fischer's Medical Source Statement, which the ALJ properly discounted.    Moreover,    the    Seventh    Circuit    has    held    in    similar

18

circumstances that an ALJ's RFC decision is supported by substantial evidence even where the ALJ did not specifically address fatigue. *See Green*, 781 Fed. Appx. at 528. In *Green*, the ALJ did not specifically address the claimant's sleep apnea or next-day fatigue. The court held that the ALJ was not required to account for the claimant's alleged need to nap during the day, because as here, the ALJ discounted the claimant's symptom allegations. *Id.* Furthermore, the claimant in that case failed to show that fatigue limited her in ways beyond what was set forth in the RFC. *Id.* Thus, the ALJ's failure to specifically address fatigue amounted to harmless error. *Id.* Similarly, here Regina does not specify what fatigue-related limitations the RFC fails to capture, other than her speculation that fatigue "may" cause her to be off-task more than 15% of the workday. (R. 12, Pl.'s Mem. at 9.) That speculation is insufficient to show that the ALJ committed reversible error in assessing her RFC.

With respect to obesity, Regina argues that the ALJ failed to account for the combined impact of her obesity, musculoskeletal issues, and osteoarthritis, and did not consider how obesity might exacerbate the pain caused by those conditions. (Id. at 9-10.) An ALJ is required to consider the impact of a claimant's obesity on the RFC and to bear in mind the potential combined impact of obesity and other impairments. *See* SSR 02-1p, 2002 WL 34686281, at *1 (Sept. 12, 2002). Here the ALJ noted that Regina did not allege that her obesity is a severe impairment, but nonetheless observed that her obesity would be considered only a "Level 1" severity under SSR 02-1p and stated that the assigned RFC accounted for limitations

stemming from that condition.  (A.R. 17.)  Moreover, at the hearing the ALJ asked the ME about the combined impact of Regina's obesity and knee pain, and the ME opined that that her obesity is only mild and an individual with her level of obesity and knee pain could engage in light work (he changed that opinion to sedentary if the fibromyalgia symptoms are fully credited).  (Id. at 83-86.)  The ALJ gave significant weight to the ME's opinion, which adds confidence that the ALJ's RFC assessment reflects the impact of obesity.  The ALJ could have provided more detail on this issue, but the Seventh Circuit has made clear that even where the ALJ does not address the combined impact of a claimant's obesity and other impairments at all, any error is harmless so long as the decision makes clear that the ALJ was aware of and considered obesity.  *See Kittelson v. Astrue*, 362 Fed. Appx. 553, 557, 559 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006). That is especially true in cases like this one where the claimant fails to identify how her obesity limits her functioning beyond the limitations set out in the RFC assessment.  *See Hernandez v. Astrue*, 277 Fed. Appx. 617, 624 (7th Cir. 2008). Given that the ALJ expressly acknowledged consideration of the impact of obesity in crafting the RFC, the ALJ's reliance on the ME's testimony addressing the combined impact, and Regina's failure to explain how her obesity creates additional limitations, the ALJ's failure to provide more details supporting this aspect of the analysis amounts to harmless error.  *See Prochaska*, 454 F.3d at 736-37.

Regina also challenges the ALJ's treatment of her moderate limitations in concentration, persistence, or pace (also known as "CPP") and social functioning in

the RFC assessment. Starting with the CPP limitations, in her opening brief Regina challenges the ALJ's hypothetical to the VE as well as the RFC assessment limiting her to "simple, routine, repetitive tasks," and the ALJ's assessment that despite her moderate limitations in this domain Regina can "complete such tasks timely and appropriately, with no fast-paced production rate or strict quota requirements." (A.R. 14.) According to Regina, the hypothetical and eventually assigned RFC "did not account for all limitations resulting from [Regina's] limitations in concentration, persistence, or pace," although she does not identify which limitations the ALJ failed to capture.[3] (R. 12, Pl.'s Mem. at 7-8.) Regina also asserts without argument that "[i]t is not clear what the ALJ meant by 'fast-paced production rate,'" because the ALJ left that term undefined. (Id. at 7.)

The issue of whether RFC restrictions to simple, routine, repetitive tasks adequately capture moderate CPP limitations has become fertile ground for litigation, likely because the caselaw governing this issue is context- and case-specific, without a bright-line rule. The Seventh Circuit has made clear that both the hypothetical posed to the VE and the RFC assessment have to account for even moderate limitations in CPP, but at the same time has insisted there "is no magic words requirement" for how to do so correctly. *See Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). As a general rule, to fulfill this requirement an ALJ "may not rely merely on catch-all terms like 'simple, repetitive tasks' because there is no

---

[3] For the first time in her reply brief Regina asserts that the ALJ "could have" limited her to low-stress work with an option to step away if she felt claustrophobic. (R. 19, Pl.'s Reply at 2.) Arguments raised for the first time in a reply brief are considered waived. *See Frazee v. Berryhill*, 733 Fed. Appx. 831, 834 (7th Cir. 2018).

basis to conclude that they account for problems of concentration, persistence or pace." *Id.* (quotation marks omitted)). Instead, the ALJ is required to engage in an individualized evaluation of the claimant's limitations without falling back on a one-size-fits-all approach. *See Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020). So, for example, where an ALJ accommodates moderate CPP restrictions with simple tasks because the evidence shows the limitations are triggered by complex tasks, such a restriction is acceptable. *See Bruno v. Saul*, __ Fed. Appx. __, No. 19-3196, 2020 WL 3497633, at *3 (7th Cir. June 26, 2020).

Here the ALJ did not rely on shortcuts or a boilerplate approach to Regina's moderate CPP limits. With respect to concentration, the ALJ specifically concluded that Regina has "sufficient concentration" to engage in "simple, routine, repetitive tasks," and that she could "complete such tasks timely and appropriately." (A.R. 14.) In terms of persistence, the ALJ determined that Regina should not be subjected to strict quota requirements. (Id.) And as for pace, the ALJ made clear that despite her moderate limitation, she can perform tasks that do not include "fast-paced production rate" requirements. (Id.) In *Martin* the Seventh Circuit concluded that a remarkably similar RFC was sufficiently tailored to meet the claimant's moderate CPP limitations. 950 F.3d at 374. Accordingly, and because Regina has not highlighted any additional restrictions that the RFC should have included, the court disagrees with Regina's conclusion that the RFC does not fully

capture her moderate CPP limitations.[4]  *See Jozefyk*, 923 F.3d at 498 (noting that there is no reversible error in RFC assessment where claimant fails to hypothesize additional CPP limitations that ALJ should have included).

In challenging the mental RFC Regina relies on *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015), to assert that the RFC is unsupportable because, according to her, "[i]t is not clear what the ALJ meant by 'fast-paced production rate.'"  (R. 12, Pl.'s Mem. at 7.)  In *Varga* the court found the ALJ's failure to define the term "fast-paced production" to be "problematic."  794 F.3d at 815.  But in *Martin*, the court clarified that its holding in *Varga* focused on the question of concentration, not on any vagueness in the term "fast-paced production."  *Martin*, 794 F.3d at 374.  Just as there are no magic words for capturing moderate CPP limits, the court in *Martin* confirmed that there are no specifically precluded terms either.  *Id*.  Because Regina did not develop any substantive argument to explain why the limitation to fast-paced, production-rate work failed to accommodate her persistence limitations, she has not shown that the ALJ erred in assigning that restriction here.

Turning to her moderate limitation in social functioning, Regina argues that limiting her to only occasional contact with co-workers and supervisors and no contact with the general public fails to accommodate the full extent of her anxiety. According to Regina the ALJ failed to explain how she could interact occasionally

---

[4]  In assessing Regina's RFC the ALJ gave some weight to the opinions of the two state agency consulting psychologists, who agreed that Regina's mental health limitations do not significantly affect her cognitive functioning and allow her to "engage in complex work activities" in which she could sustain the CPP required for full-time, competitive work.  (A.R. 18.)

with co-workers or supervisors despite evidence that she reported having panic attacks and severe anxiety in crowds or out in public, arguing that this evidence supports a finding that she could not interact with supervisors at all. (R. 12, Pl.'s Mem. at 8-9.) To the extent Regina is arguing that her anxiety is triggered by being in public, it is unclear how an RFC precluding contact with the public fails to accommodate that limitation. And in any event, Regina's argument is premised on a disagreement with the ALJ's judgment with respect to the kinds of interaction she can sustain despite her anxiety. Because the ALJ considered the totality of the anxiety evidence, assigning stricter limitations than those assigned by the state consulting psychologists, and because this court's role is not to substitute its own judgment for that of the ALJ, Regina has not shown that a remand is warranted with respect to her limitations in social interactions.

## Conclusion

For the foregoing reasons, Regina's motion for summary judgment is denied, the government's is granted, and the final decision of the Commissioner is affirmed.

ENTER:

Young B. Kim
United States Magistrate Judge

24